WILLIAMS v. DELAWARE, L. & W. R. CO.

(Supreme Court, Appellate Division, Fourth Department.  March 22, 1899.)

1. INJURY TO EMPLOYE—CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF.
In an action by a brakeman, against the railroad company by which he was employed, for injuries received while passing under a bridge which crossed the track, the burden is upon plaintiff to satisfy the jury by the preponderance of evidence that he was free from contributory negligence, and that he did not know it was a low bridge, and also that, in the exercise of ordinary care, he could not have ascertained that fact.

2. SAME—EVIDENCE.
In an action by a brakeman, against the railroad company by which he was employed, for injuries received while passing under a low bridge which crossed the track, at the first trial the plaintiff's evidence showed that he was guilty of contributory negligence, in that he knew, or had means of knowing, that the bridge was a low one.  On the second trial he attempted to change his testimony, to relieve himself from the imputation of negligence.  The conductor testified that he had told the plaintiff about this low bridge, which information the plaintiff denied.  *Held*, that the evidence did not support a verdict for plaintiff.

Appeal from trial term, Oneida county.

Action by Ellis R. Williams against the Delaware, Lackawanna & Western Railroad Company.  From a judgment in favor of plaintiff, and an order denying a motion for a new trial, defendant appeals.  Reversed.

Plaintiff seeks to recover damages sustained by him, while in the employ of the defendant as brakeman, on the 8th of July, 1882, while riding on top of a freight car in the village of Norwich. Mitchell street, in that village, crosses the defendant's road by means of a bridge over the road, 16 feet 1½ inches above the top of the rail.

Argued before HARDIN, P. J., and ADAMS, McLENNAN, and SPRING, JJ.

William Kernan, for appellant.
W. T. Dunmore, for respondent.

PER CURIAM.  Plaintiff in April, 1883, commenced this action, and in his complaint alleged that the defendant was guilty of negligence, by reason of the bridge which carries Mitchell street over its tracks not being sufficiently elevated, and in his complaint, among other things, alleged that the defendant did not furnish sufficient brakemen to operate the train on which the plaintiff was engaged.  The defendant admits its incorporation and its operation of the railroad, substantially as alleged in the complaint, and denies that it was guilty of any negligence, and alleges affirmatively that,

if plaintiff received any injuries as stated in the complaint, they were induced and caused by his own negligence while acting as a brakeman in the service of the defendant. The issues were brought to trial at a circuit held in Oneida county, and a verdict was recovered by the plaintiff. The defendant took an appeal to the general term, where the judgment entered upon the verdict was reversed, and a new trial ordered. That decision is reported in 39 Hun, 430. In the trial then under review it appeared that at the time of the accident "four brakemen were usually employed on the train on which the plaintiff was injured, but that on the morning of the accident there were only three." The judge charged, in effect, that if the jury should find that the defendant did not furnish a sufficient number of brakemen, and that its failure so to do was the cause of the plaintiff's injury, he was entitled to recover. It was held that that charge was erroneous, and "that the evidence wholly failed to show that the plaintiff's injury was the natural or probable consequence of the defendant's omission to employ a sufficient number of brakemen, or that the accident would not have happened but for such omission." In the course of the opinion delivered by the learned judge in that case, it was said:

"Where, however, a servant enters upon an employment from its nature necessarily hazardous, he assumes the usual risks and perils of the service, and also those that are known to him, or which are apparent to ordinary observation."

Several cases are cited in support of that proposition. The learned judge then adds, viz.:

"If, therefore, the bridge in question was not of sufficient height to render it safe for defendant's employés to pass under it when required in the discharge of their duties, and that fact was either known to the plaintiff, or might have been discovered by ordinary observation, he was not entitled to recover."

The bridge had stood as it was at the time of the accident since 1874, and was in plain sight of persons standing on top of freight or box cars approaching it from either way. Prior to the accident in question the plaintiff had acted as fireman on a local freight train running between Utica and Binghamton, for about a year ending in April, 1882. The train on which the plaintiff worked at the time he received the injuries consisted of 12 cars, and a passenger coach at the rear. When the plaintiff was struck, he was walking south on top of the box cars, and the train was moving north. He was hit on the back of the head by the bridge while on top of the box car, which was the second box car from the engine. The case was again tried in May, 1886, and the plaintiff recovered a verdict of $4,900; and the judgment entered on that verdict, and the order denying the motion for a new trial, were affirmed in January, 1887. Thereupon the defendant took an appeal to the court of appeals, and the case was heard in the Second division of that court in 1889, and a decision was rendered reversing the judgment. The opinion written on that occasion is reported in 116 N. Y. 628, 22 N. E. 1117. In May, 1890, the case was again tried at the Oneida circuit, and resulted in a nonsuit, and an appeal was taken to the general term, where

the judgment of nonsuit was affirmed; and the decision is reported, and the opinion delivered then, in 92 Hun, 219, 36 N. Y. Supp. 274. The plaintiff took an appeal to the court of appeals, where the judgment was reversed. The opinion delivered in the court of appeals is reported in 155 N. Y. 158, 49 N. E. 672. The case was again tried in May, 1898, and the jury rendered a verdict in favor of the plaintiff for $4,500. From the judgment entered on that verdict, and from the order denying the motion for a new trial, this appeal is taken.

When the case was last in the court of appeals (155 N. Y. 158, 49 N. E. 62), it was held:

"Where the plaintiff's testimony on a new trial differs from that given by him on the first trial, and, if credited by the jury, would entitle him to a verdict, the trial court has no right to treat it as untrue, as matter of law, and take the case from the jury, but should leave it to the jury to say whether the testimony is entitled to belief."

In the course of the opinion delivered, it was said:

"The court, believing that the plaintiff had changed his testimony falsely, with a view of avoiding the effect of the decision of this court, concluded to disregard his testimony on this trial, and held that what he testified to on the former trial was true. There can be no doubt but the learned courts below, both at trial and general term, were actuated in their course by most praiseworthy motives, fully believing that they were promoting good morals, honesty, and justice; but the question is, was their holding in accordance with law? On one of the trials it is quite likely that the plaintiff's testimony was truthfully given, but whether on the first or the second trial was for the jury, not the court, to determine. * * * In this case the plaintiff gave testimony which, if credited by the jury, would have entitled him to a verdict. The trial judge apparently did not credit it, and it is quite likely that his view of the testimony was the correct one; but the difficulty with the situation is that, under our method of procedure, it was the province of the jury, not the court, to say whether his testimony was entitled to belief."

It is now contended in behalf of the respondent that it is the duty of this court to allow the verdict brought here for review to stand, notwithstanding the plaintiff changed his testimony on a vital question involved in the case. In the course of the opinion delivered when the case was in the Second division of the court af appeals (116 N. Y. 632, 22 N. E. 1118), it was said:

"The only question which we shall consider in this case is as to whether or not the plaintiff was guilty of contributory negligence; and this depends upon the question as to whether he knew, or ought to have known, that this bridge was low, and that he could not pass under it whilst standing upon the top of the box car. Upon this point it appears, from his own testimony, that he first began work upon the defendant's road in 1880, as a fireman on one of the engines, and for six or seven months had run over this road, passing under the bridge daily. * * * Upon his cross-examination he conceded that he knew of the bridge and its location; that, as fireman, he passed under it daily, and could see it, and after he became a brakeman he passed under it daily; that he understood his place as a brakeman; that when they were approaching a village it was his duty to be on top of the train, so as to apply the brakes if required; that this was one of the written rules of the company; that as they were running south, through the village of Norwich, they were in sight of the bridge; that it was in the daytime, and the bridge was in plain sight when he turned his back to it to go to the rear of the train; that he was usually on top of the box cars when they passed under the bridge; that it was his place to be there. Upon the redirect examination he further testified that: 'I never knew of passing under the bridge on top of a box car; that is, to name the car, or remember it. All I can say is that I have been

on the train when it passed under it, going back and forth.' 'It is quite evident from this testimony that he had on numerous occasions passed under this bridge whilst on top of the train; and, if so, he must have known, had he exercised ordinary care and observation, that it was not of sufficient height to permit a person to pass under it whilst standing on top of a box car of the company. * * * True, he had never measured its height from the rails, but, having passed through under the bridge whilst on top of the cars, he must have known that it was not of sufficient height to permit him to stand while so passing. The rule is that a servant, who enters upon employment from its nature hazardous, assumes the usual risks and perils of the service, and of the open, visible structures known to him, or of which he must have known had he exercised ordinary care and observation." De Forest v. Jewett, 88 N. Y. 264; Appel v. Railroad Co., 111 N. Y. 550, 19 N. E. 93.

See, also, Ryan v. Railroad Co., 51 Hun, 607, 4 N. Y. Supp. 381.

As soon as the opinion of the Second division was promulgated, the plaintiff was informed of the pivotal question in the case, relating to his alleged contributory negligence; and he was made aware of the fact that if he knew, or had sufficient opportunity, by means of ordinary observation, to know, the situation of the bridge, he was not entitled to recover of the defendant. During the trial now brought in review the plaintiff sought sedulously to escape the force of the decision made by the Second division of the court of appeals, by changing his testimony in a very essential respect. To illustrate, we take from the record now before us the following:

In his evidence in chief the witness said:

"I didn't know on the morning of July 8th, or at any time prior to the time I was injured, that this Mitchell street bridge was what was known as a 'low bridge.' No notice, prior to the accident, had ever been given to me by the company,—by the defendant,—or any of its employés or officers, that that was a low bridge. I had never been told by anybody to look out for it, or anything to that effect. I didn't know, prior to the accident, that that bridge was not of sufficient height to permit me to stand upon the top of a box car and pass under it in safety. I had never passed under that bridge on the top of a box car, going either north or south; I had never been near that bridge before the accident, nor off from the train. I had never been off of the train near the bridge, prior to the accident, on the ground. * * * We never had any loading or unloading to do near the Mitchell street bridge, nor any shifting to do there. We never had any freight to leave there,—near that bridge."

In the course of his cross-examination he was asked:

"Q. Did you swear on a previous occasion that you were on top of the train, generally, going towards Norwich, when you were approaching it? A. I wouldn't say that I did; no, sir. Q. You won't say that you did, or won't say that you didn't? A. No, sir. Q. Did you swear on one of those occasions, 'It might be true that I was usually on top of the box cars when I passed this bridge, as brakeman'? A. No, sir; I wouldn't swear that I did. Q. Nor you won't swear that you didn't, will you? A. No, sir. Q. Did you swear on the other trial in this way: 'Perhaps it is true that, during those two or three weeks that I was going south,'—that is, coming down from Utica, —'I was usually on top of the box cars when I passed the bridge'? A. Well, if I did, it was a big mistake. Q. No, no; did you swear? A. I wouldn't swear that I did; no, sir. Q. Did you know that the question was raised in the court as to whether you had ridden under this bridge on top of the box cars? A. No, sir; I don't. What do you mean,—'in this court'? Q. No; in the courts on appeal. A. No, sir; I didn't. Q. You have talked with your counsel about the decisions of the courts? A. I have talked with them a very, very few times for the last eight years. * * * Q. Now, was this question put to you on the former trial, 'Q. Were you usually,—I am speaking usually, —during those two or three weeks, when you were going south, on the top of the box cars when you passed this bridge?' and did you answer, 'Coming in

from this way, yes, sir; most generally?' A. I wouldn't swear to that. I wouldn't swear that I said that. Q. Will you swear that you didn't? A. No. Q. Didn't your counsel put this question to you—your own counsel—on the former trial: 'Q. Now, you say, in passing under this bridge,'—the counsel has had you say it several times,—'you were sometimes upon the top of the box cars,' and did you answer, 'Yes, sir'? A. I wouldn't swear that I did; no, sir. Q. You won't swear that you didn't, will you? A. No, sir."

After the witness had given the testimony which we have quoted, the defendant read from his evidence given on the former trial, as found in the stenographer's notes, as follows:

"Q. Going south, were you not usually on the top there, looking at your brakes, as you run down towards the depot? A. You said 'running on the car.' Q. I mean standing on the car? A. Sitting on the car, because we were always running there very slow. Q. Were you usually,—I am speaking usually,—during these two or three weeks, when you were going south, on the top of the box cars when you passed the bridge? A. Going in from this way; yes, sir, most generally. Q. Then, when you came back and ran in on the switch from one end or the other, you were usually on the top of the car, being a middle brakeman? A. Oh, sometimes I would and sometimes I wouldn't be, because we had to stop before you get there, and then it didn't require no brakes. * * * Q. Now, you say, in passing under this bridge, —the counsel has had you say it several times,—you were sometimes upon the top of the box cars? A. Yes, sir. * * * Q. Your place, ordinarily, when you went in on this siding, was on the top of the cars, near the bridge, wasn't it? When you ran in on this siding, ordinarily, your place was on top of the cars, wasn't it? A. I suppose that was the place; yes, sir, unless we had some other work to do. Q. Didn't a part of your work often stand under the bridge while you were on the siding? A. Yes, sir."

From his testimony given on the second trial there was read the following:

"Q. What was your duty, when the train was fully manned with the ordinary crew, in running a train during the day? Whereabouts on the train were you, generally? A. On the top of the train, generally. If it wasn't running down grade, my work was all over; I needn't do any work. * * * Q. When you were coming from Binghamton, towards Utica, and arrived at Norwich, you say, ordinarily, you ran on this side track to let the passenger train pass you? A. Yes, sir. Q. And that siding is the one that passed under the bridge? A. Yes, sir. * * * Q. Did you have to go on this siding at Norwich? A. On the coal train? Q. Yes. A. Yes, sir; if we stopped there,— that is, sometimes we would. Q. Sometimes you stopped to let something pass? A. Yes, sir. Q. On the siding that was this side of the passenger depot? A. Yes, sir. Q. What was the occasion of your running off on that there? A. To let the train by. If there was a train coming, we would have to get on there sometimes. * * * Q. Suppose you came up in the ordinary way to the freight depot, and had changed your cars below, and let the passengers off; wouldn't you go on this siding, and let the passenger train pass? A. Yes; but on these there would not be many passengers. By the Court: Q. Did you sometimes do it? A. Sometimes ran on, and sometimes off. Q. How often, or how many times, did you go on this siding,—the blue siding? A. I couldn't tell you. Oh, a good half of the time, of course. By Mr. Kernan: Q. A good half of the time you stopped on this switch? A. Yes, sir. * * * Q. Were you not generally, every day, as you were running south through the village of Norwich, there,—in sight of this bridge, and under it,— were you not generally on top of the box cars of the train? A. No, sir; that is, I was not so every time. Q. I say usually, ordinarily? A. Ordinarily, perhaps, I was. Q. Why do you hesitate? I will read you what you said before: 'I was usually on top of the box cars when we passed the bridge.' A. Usually; yes, sir. Q. That is true? A. I should say it was my place to be there; yes, sir. Of course, I couldn't say where I was. * * * Q. I don't ask you that. There was no equivocation before about it. 'I was usually on top of the box

cars when I passed this bridge as a brakeman.' Is that true? A. Well, it might be true."

We have given sufficient quotations from the evidence given by the plaintiff on this trial, as well as from his evidence given on former trials, to show very clearly that he has shifted his evidence, and that he has sought to get around the decision made in the case when in the Second division of the court of appeals, and that he has sought to relieve himself from the imputation of contributory negligence.

The learned trial judge, in the course of his charge, alluded to the circumstance that this accident occurred before the passage of the act of 1884, relating to "notices," "warnings," or "telltales," and then instructed the jury, viz.:

"Yet if the plaintiff was notified that this was a low bridge, or if he knew it from any other source, or if, in the exercise of ordinary care, he should have discovered the fact that it was a low bridge, then, under the circumstances developed in this case, there would be two difficulties in the way of the plaintiff's recovery: In the first place, he would be properly held or found to be guilty of contributory negligence, in knowing the bridge was there, and in turning his back towards it, and not avoiding it; and upon another theory, too, such as is often held by the courts, and mixed up with this question of contributory negligence, and that is as to the element of the duty of the defendant itself. For while ordinarily, and as a general proposition, the duty of a defendant, a railroad company, is to furnish for the use of its employés a reasonably safe and suitable roadbed, cars, and appliances, yet this duty is not an absolute one; and it is to be modified by the consideration that the railroad company is not obliged to furnish for the use of its employés any different construction from what it has when he sees fit to go into its employ, provided he knows what the condition is, and knows and appreciates the dangers which are attendant and naturally incident to the use of them as they are. So that, if the plaintiff, when he commenced to work for this company, or at any other time before this accident occurred, knew the fact as to this being a low bridge, and understood and appreciated the dangers attendant upon riding on the cars under it, why then, as to him, with that knowledge, the defendant had no duty imposed upon it to furnish him any different construction from what it had furnished. * * * A person who goes into the employ of a railroad company assumes all the risks which are ordinarily incident to the employment in which he takes service, and, as connected with it, he assumes the ordinary risks of such a condition of things as existed here, provided he knew of it, or provided he should, by the exercise of ordinary care and prudence, have known of it, and have known the danger attendant upon the use of the structure as it was. * * * So that that, gentlemen, is the most important item of evidence in this case that you are to consider, and, you are to say on which occasion this man told the truth,—whether on those two former trials, when he admitted that he did ride on top of a box car under this bridge, or whether on this trial, when he testifies that he never did."

Although the judge called the attention of the jury to the fact that the conductor testified that he had told the plaintiff about this low bridge, which information the plaintiff denied, yet the jury seems to have gone off upon the idea that the evidence of the plaintiff was such as to relieve him from the imputation of contributory negligence. We think the plaintiff was called upon to bear the burden, and to satisfy the jury by a preponderance of evidence that he was free from contributory negligence, and that he did not know that it was a low bridge, and also to satisfy the jury that, in the exercise of ordinary care and caution, he did not ascertain that it was a low bridge. We think the verdict is against the preponderance of the evidence, and therefore the trial judge might properly have set it aside on the mo-

tion for a new trial on the minutes. We think the judgment and order should be reversed, and a new trial ordered. See Cleveland v. Steamboat Co., 29 App. Div. 627, 52 N. Y. Supp. 1139.

Judgment and order reversed, and a new trial ordered, with costs to the appellant to abide the event.